which is Coca-Cola v. Commissioner of Internal Revenue Mr. Garr, we are ready when you are. Thank you Judge Grant and may it please the Court. The Tax Court's decision should be reversed for three independent reasons. First, the Tax Court improperly excused the IRS's arbitrary bait-and-switch in transfer pricing methods. Second, the Tax Court rested its decision upholding the IRS's new transfer pricing method, the CPM method, on a flawed legal ownership rule that contravenes the express terms of the IRS's own regulations. And third, the Tax Court improperly allowed the allocation of income that was indisputably blocked by Brazilian law. Because I think it cuts through everything, I'd like to start with the legal error at the heart of the Tax Court's decision upholding the IRS's new CPM method. The Tax Court, and this is clear from pages 116 to 118 and pages 150 to 158, adopted a legal ownership rule under which the only thing that mattered was Coca-Cola's ownership of the trademarks. And that therefore the supply point company's licenses and their marketing investments for those licenses were legally irrelevant. And that ruling, which is the heart of the Tax Court's decision, is clearly at odds with the IRS's regulations. And I can point the Court to three regulations. I have a question about that first. Is the Tax Court correct that Coca-Cola allocates these marketing expenses to the supply points rather than kind of the other way around? I don't know if that's the best way to say it, but from my read, the IRS decision, the Tax Court said this is a kind of post hoc allocation of marketing expenses rather than a reflection of what these companies actually independently choose to spend. Is that correct or incorrect? No, I mean first of all it's established, and the citations are at pages 19 to 20 of our reply brief, that the marketing expenses are on the books of the supply point companies. And that means that they incur those expenses. Right, but I'm not asking whether they're on the books. Clearly they're on the books, but how do they get on the books is more my question. So the supply point companies, three of the six supply point companies actually engage in their own marketing efforts. Another three use service companies to market and they pay for that, just like Nike might get a separate firm to market its shoes. But the supply point companies pay for that. And the IRS's own expert, and you can see this at page 144 of the Tax Court opinion, acknowledged that supply point companies promote the brands and local is it disregarded all of that because Coca-Cola owns the trademarks and the supply point companies only have the licenses and their own independent marketing efforts. And that violates three sets of regulations. The first one is it FTF31, and that's that regulation, and this is at page 70 of the addendum, explicitly makes clear that the trademarks and the licenses or other contractual terms are distinct, the way the regulation refers to it as respective intangibles. So they're different. And yet here the Tax Court said because the Coca-Cola itself owns the trademarks, the supply points get no credits for the licenses. The second regulation is dash 40 F4, and that what that says is that the transfer pricing method must account for the value added by a party to the intangibles owned by another. And so here what happens is supply, the Coca-Cola licenses its trademarks, which are among the most valuable products in the world, to supply points around the world to market them in local markets according to their distinctive tastes, cultures, sports, heroes, and the like. Supply points do that, and they add immense value to those brands. I'm not just the iconic Coca-Cola label, but the hundreds of brands that are specialized to local markets. And yet under the Tax Court's decision, the supply points get no credit for that, even though the regulations, the term I just mentioned, says you have to account for the value added by another. And the third thing I would point you to is the examples accompanying those two regulations. And they're at pages 71 and 73 of the addendum, and they explicitly show with examples of licensing of athletic gear and the like, that licenses and trademarks are different, and that companies that actually license and go out and improve the value of trademarks have to get credit for it. And yet the CPM method completely excluded consideration of intangibles, which is... Sorry, Jim. No, no. I had a couple of questions, and I wanted you to address the Brazilian aspect of the case. And then I also wanted you to talk about... It's unclear to me why the government changed the method only as to, I think, six or seven countries, and left the 10-50-50 method with regards to the rest of the accounting. Right. So as to the Brazilian income, Your Honor, I would point you to the Eighth Circuit's decision in the 3M case, which is on all fours with this case, and explains why, as a matter of law, the IRS cannot allocate under 482 income that is blocked. That goes back to the first security case in the Supreme Court. There's basically, like, a ceiling for how much can be recovered. Under Brazilian law, right. There were 50... Now, I mean, Congress could pass a law that says that that could be Sure. Right. But that has not happened. That has not happened, and the Supreme Court definitively defined that term in the first security case. Now, below, the tax court relied on a regulation where the IRS tried to change the law using its Chevron deference, but the IRS doesn't even defend that regulation before this court in light of Loeb or Bright. In the 3M case, had 3M previously been characterizing its payments as dividends? It had. I think note, too, the decision recognizes that, but that really doesn't make a difference, Your Honor, because here what you have is the only reason Coca-Cola is treating certain payments as dividends was because of the 10-50-50 agreement that the IRS has abandoned here. And then what the IRS says is, you're going to have to pay billions of dollars, hundreds of millions of dollars of additional money from the Brazilian supply point to Coca-Cola, and you have to call them royalties. And it's a 3M decision makes clear the IRS can't require the taxpayer to, number one, violate foreign law, and number two, structure its affairs in a particular way. I think that the IRS's point, though, as I read it, was that Coca-Cola had already been paying more than this Brazilian limit and calling it dividends, and since that point hadn't been raised before, why was it being raised now? And why was it being raised only to the amount over what Coke had been paying before as opposed to over whatever Brazilian law seems to allow? So the IRS is coming in and saying, we need to reallocate. You owe billions of dollars additional royalties, and you have to pay them as royalties in violation of Brazilian law. You can't pay them as dividends. And the reason the 3M itself, I think, answers that question. And if I could go to the inconsistency point, because I think that this is really important, and it goes to the bait-and-switch. The IRS acknowledged in the 1996 closing agreement that the 1050-50 method produced arm's-length results as a matter of federal income tax law in Section 482. It subsequently told Coca-Cola in 2009, after the tax years at issue, that the continuing application of the 1050 method was appropriate. That's at Exhibit 246J, page 2. And the IRS continued to apply the 1050-50 method to 11 of the 18 supply points around the world. So this is the height of inconsistent treatment to similar circumstances. The IRS has no response. And it's even worse because the reason why the IRS did this is it's entirely opportunistic. And the other 11 supply points were in countries with double taxation treaties, which meant if the IRS came in and jacked up the income taxes owed to the United States, the other countries could object and they'd have to hash it out through a process. So this is both arbitrary and capricious. It's entirely opportunistic. And the government, you know, frankly, has no response to this. It says motives are irrelevant. But we're not objecting to the motives. We're objecting to the inconsistent treatment of indisputably similar situated taxpayers. And I think it also says that you didn't raise it until too late. What's your response at that point? So exactly what the tax court said, which was it acknowledged in its ruling on the motion for reconsideration that we had raised it. In fact, rejected to our arguments because it had rejected them earlier. And if you go to the tax court's decision, you can see that it refers to our argument that the IRS pulled the rug out from underneath us. And that's exactly what it did here, Your Honors. The IRS points... It is challenging. I would agree with you on that. But do you agree that the IRS was not bound to continue using the 1050-50 method if it determined that it wasn't resulting in the tax liability that Coca-Cola really did inherit? So that's number one, if you agree that they were not bound by that method forever. And then number two, even if you don't agree with the CPM method, what are you proposing in the alternative? So absolutely, the IRS is not bound in perpetuity to any method. But in the situation where it induces legitimate reliance interests on the taxpayer that it can lawfully apply a particular method, which is very different than the typical audit, but here there's overwhelming evidence that the IRS repeatedly blessed the 1050-50 method and led Coca-Cola to believe that it could structure its affairs around that and continue to apply it, the IRS had to give us notice and an opportunity to change our affairs, negotiate other agreements with other countries before retroactively imposing this new method on Coca-Cola, which wildly increased its prices. So the settlement agreement that you think gave that assurance, or is it the 2009, the kind of 2009 notice that this 1050-50 was appropriate? I think if all we had was the closing agreement, we wouldn't be making this argument, Your Honor, but it's the combination of circumstances. The statement in 2009 that the continuing application of 1050-50 is appropriate, the continuing application of that method to other supply points, the fact that the IRS enlisted Coca-Cola to go out to other countries to convince them to accept 1050-50. I mean, we pointed to Judge Kavanaugh's jaywalking hypothetical in our brief, the situation where, you know, you can't have a police officer that says you can cross the street there and when people get to the other side, hand them a ticket for jaywalking. Here it's even worse. The IRS said to 18 of the supply points for Coca-Cola, you can continue to apply the 1050-50 method. The supply points did that, they got to the other side and the IRS handed a billion-dollar ticket to six of the supply points and said you were wrong in applying 1050-50 and let the other 11 go free. I mean, that's the height of arbitrariness and the IRS's main response to that is it's not subject to the same rules and foundational arbitrary and capricious principles which predate the APA as all other administrative agencies. The Supreme Court has emphatically rejected that kind of tax exceptionalism and I hope you ask the IRS. I mean, in the most blatant bait-and-switch situation, does the IRS really think it has that authority? Here the extraordinary circumstances that predated the IRS's retroactive imposition of its new method, you know, would be arbitrary and capricious as applied to any other agency. A lot of the cases that you cited related to arbitrary capricious review or related to rulemaking, which obviously I don't think you're contending that this is a rulemaking, you know, it's the tax court. So what's your source for these obligations, your statutory regulatory source for these? It can't be APA rulemaking standards. So we're not relying, we don't need to rely directly on the APA because as the Supreme Court recognized in the Fox versus FCC versus Fox television stations, there's ordinary understanding of arbitrary capricious background principles. And for example, in the Ohio versus EPA case, the Supreme Court decided it invoked arbitrary capricious principles in construing the Clean Air Act. One of the cases we cite, which is an older case, 1928 from the Sixth Circuit, shows how far back this principle goes. It's an ordinary tax situation where the court, it's Woodward versus Kales, where the court embraced these principles and said the IRS couldn't just change things after the fact because it changed its view. And I would, you know, Justice Sotomayor and Justice Kavanaugh, just a few weeks ago in the Vanna Docks case, acknowledged in their concurring opinion that if the government tells you that you can do something and that it's lawful and then just switched retroactively, that that would raise serious due process concerns. And so the government's notion that none of this applies, that the IRS can tell a lawfully pay your taxes this way, repeatedly, and then retroactively go back and say you screwed up, you trusted us, we're going to increase it dramatically. It seems to me really that the argument that you're making is really it's a retroactivity issue because if they said to you going forward you have to now do the CPM method and not the 10-50-50 for everyone, would that be a problem? Not at all. We're entitled to notice just like anyone else. And here the IRS stipulated it never provided notice, even though it was in close coordination with Coca-Cola and its employees all throughout, it's continuously auditing Coca-Cola for compliance with this method. So when, when do you think, kind of on a logistical or regulatory basis, when and how should the IRS have provided notice of its intent to use this different approach? As soon as it wanted to switch. It should have said I know that we've repeatedly applied 10-50-50, I know that we just said that this continuing application of this method was appropriate, but we're reassessing things. We're going to come in with a new method and you have notice and if they had told us that, we could have restructured our affairs, we could have tried to negotiate advanced pricing agreements with other countries, and they denied us that opportunity. We're not saying that the IRS had to apply that method in perpetuity. We would still be here challenging it because the method, the new method is fundamentally flawed. But, but all they had to do is give us the same notice that any other American is entitled where the government tells them you can do something lawfully and then comes back and says you have to do something different. I think that, I'll say that makes sense to me, but I'm still not necessarily certain where you get that obligation besides, I mean, I guess you're not making obviously a due process argument. I mean, I'm still not certain where you're getting that, that requirement, which again seems fair and reasonable, but I'm just trying to find its source. So, first, we did also make the due process argument, but, but more generally, Your Honor, it's undisputed that under section, for section 482 allocations, the, the fundamental question is that the, the secretary has to show that didn't act arbitrary and capriciously. So, it's an arbitrary and capricious standard that governs this determination. Is it related to when, to when and how the switch is made, though, or to what the substantive nature of the exercise of the 42 authority is? It's both, and that gets to the, you know, background understanding of arbitrary and capricious. Again, we don't need to rely on the APA. We think the IRS is wrong that it gets some kind of exception to the APA, but the Supreme Court acknowledged FCC versus Fox Television and other cases that there are background principles of arbitrary and capriciousness. One of that is the way in which you reach a result, and the other is the substantive nature of the result, and here the IRS's new method flunks both. It engaged in improper bait-and-switch in adopting that method. That is arbitrary and capricious, and the methods on its own terms in considering only tangible assets and excluding consideration of intangible assets is wrong as a matter of law and arbitrary and capricious for that reason alone, and if I could just make one more comment on the method to bring it back to CPM itself. I'm sorry, Your Honor. No, you're fine. Go ahead. You're just stuck here for a while, I think. I'm happy to go for as long as court would like. On the method itself, I wanted to bring up the hypothetical that we made in our brief, which the government really has no answer to, which is that the way that the CPM method works, because it only considers the return on tangible assets, property, plant, and equipment, and doesn't consider at all marketing investments that supply points are making or other intangibles, licenses that they have. It means that, and the government's own expert, Mr. Newland, admitted this, that you could have a supply point that invested zero in marketing and had its products sales plummet, or a hundred million dollars in marketing and have its product sales succeed wildly, and that would have zero impact on the rate of return of royalties that the supply point could have, but conversely, if you had a supply point that simply wastefully plated its roofs in gold, then that would increase the profits they could retain, because it would increase the tangible assets at the base. That makes zero sense, and this... You haven't, Koch hasn't kind of defended the 10-50-50 method, either at the tax court or here, correct? Right, and that, frankly, Your Honor, there's another red herring that the IRS has introduced. The IRS's own regulations, and this is at 482.1.F.2.V.A., explicitly makes clear that it's the results achieved that matter, not the method, and what Coca-Cola has continuously done in this litigation is produce different ways to get to the same results, largely the same results, as the 10-50-50 method. I mean, that was the Are those results realistic, though? Because I can't remember the figures, but the profits of these supply points were extraordinary. I think the tax curve said they're off of the far end of the bell curve. Does that suggest that that is actually the best method to show what would be produced by an arm's-length negotiation? So that statement by the tax court, and there's a graph on page 112 of its opinion, that's a product of the same error as the CPM analysis, and that it excludes consideration of intangibles. It looks only to hard or fixed assets, and the supply point companies, because so much of their business is involved in marketing products, intangibles are a huge part of it. When you factor that in, then the profits are consistent with arm's-length profits, but here, going back to the results, 10-50-50, which itself doubled Coca-Cola's taxes when it was adopted, that produces a royalty rate of around 22%, and we, Coca-Cola, presented several different methods that produced similar results, and importantly, one of Coca-Cola's witnesses, expert witnesses, Mr. Willig, actually took the government's CPM and made one change. It accounted for the intangibles, the licenses and the marketing investments, and that made all the difference in the government has done here with the CPM is truly extraordinary. It's gone past pushing the limits, and I want to point to one other error that follows from the regulations as to the CPM. The tax court itself, and even the government, ultimately acknowledge that intangibles are involved here. You can look at the government's brief at page 17, and you can look at the tax court's decision in making a comparability analysis between bottlers and supply points on page 186, and so even though they try to get rid of all the intangibles by saying Coca-Cola owned the trademarks, which is a legal error, at the end of the day, the tax court and the government acknowledge that intangibles are at play, and for that reason, the CPM, the regulation makes clear, had to take into account the intangibles, and that's clear from dash 5b4, which deals with calculation of profit level index, and dash 5c2, which explicitly says that the CPM has to take into account intangible assets where they exist. Is that true in your view for both the supply points that did their perform their own marketing and those who didn't? Yes. Why? And number one, the examples in the regulations, I think that make that clear. Number two, first of all, the CPM doesn't account for the three of the six supply points that did their own marketing, but as to the others, they simply did what ordinary companies do all the time. They hired someone else to engage in marketing, paid for that marketing, and they get to benefit from it. Now, the supply points are different than the service companies who did the marketing in the sense that the supply points actually bore the risk. For example, even though they like to talk about the profits that supply points make, the Egyptian supply point actually had losses for the tax years at issue. So that's another way in which it's clear that the supply point companies are actually doing meaningful things, and there's no basis, and the ultimate standard here is arm's length, what ordinary commercial parties would do, there's no basis to disregard the supply point's own investment in marketing using service companies. There's no basis for that, but I think the fundamental legal error that the court should resolve, and you don't even get to that level of analysis, is that the entire CPM and the tax court's decision upholding it was completely skewed by this legal ownership rule, which excluded consideration of the licenses and the marketing investments. And the government may come up here and say, oh well, you know, we debate about the extent of the tangibles and this and that, that doesn't matter. I mean, please read pages 116 to 118, 150 to 158, and even footnote 52, where the tax court acknowledges that this was, the government claimed this was a dispositive legal argument, the legal ownership rule. It excluded consideration of the supply point's valuable, extremely valuable intangibles and licenses and marketing investments solely because Coca-Cola itself owned the trademarks, and that was a clear legal error that is sufficient in itself to reverse. All right, thank you. We will still give you your time for rebuttal. Ms. Rubin. Good morning, and may it please the court. In section 4082, Congress authorized the Commissioner to reallocate income that was reported by a taxpayer for transactions between related parties. Can you speak . . . I interpreted Judge Grant's, one of her questions to ask, what is the source for the due process or notice right that Coca-Cola is arguing that they were not given? Do you agree that the arbitrary and capricious standard, that within that standard, notice is somehow embedded? Because that's how I understand their argument. And in that case, they didn't have it. I don't think that's in dispute. There is no source. They've cited no source for it. They cited the G.U.R. case to say, hey, arbitrary and capricious was before the APA, and it applied to the predecessor of 482. But if you look at G.U.R., it was completely substantive. Like all other deficiency procedures, it dealt with the code, and the code's requirements does not provide any notice requirement. It provides lots of other great protections. Unlike in an APA case, this is . . . Are you saying that there's no due process requirement? Because this is not a situation . . . you have a situation where the government has negotiated with a party, and they're proceeding under a particular method. I understand the argument that, obviously, the IRS is not bound in perpetuity by an agreement that they reached or an understanding that they reached, but there still is . . . like the concept of retroactivity, of retroactively changing the method of calculation that a company is doing, seems to me a bit of a due process violation. Two answers. Number one, they're not making a due process argument. They don't make a due process argument in their appellate briefs. They made it in their reconsideration motion, which the court rejected, saying that, hey, under the Finnegan case . . . Let's just pretend that they made it, so why don't you answer my question. Sure. They got plenty of due process here, the same due process any other company gets when the Commissioner comes in and says, hey, you reported this type of transfer pricing, and it's wrong. I'm going to do a reallocation. How do you make the adjustment when you have a agreement between the parties? I guess one of my big issues that I have is that you have these supply point companies, let's say 15, and so you have 15 and they're doing 10-50-50, and then all of a sudden you decide, okay, but these six or these seven are not going to be 10-50-50. We're going to change the rules for them. How is that appropriate retroactively? First of all, on the retroactive, all tax deficiencies are retroactive. That's how it works. The companies report the taxes, they report their income, they report all their items, and then the Commissioner can examine it. Obviously, the Commissioner has resource issues, you know, just from the large business . . . That's different than, like, for an individual taxpayer and the government comes back and says you didn't pay too much or you claim something you're not entitled to, but the rules and the evaluation is the same. Here, it's a completely different method that's being used. The same rules apply. These are the same regulations. But you have company A, B, and C. They're all the same. They're supply point companies, and then for company B and C, okay, you can do 10-50-50, but for company A, no, you can't do 10-50-50. How is that appropriate? There's nothing in the code that says the Commissioner has to examine all of the entire business or all of the, say, set of supply points. But then doesn't that make it even more arbitrary? If you don't have to look at all of them, that's fair, but then you pick and choose which ones even though the characteristics on their face are the same? Actually, there's nothing in the record saying the characteristics are the same. We have four companies that were owned by Atlantic Industries, which is Cayman Includes the Irish one, which was the largest of the supply companies, and also was the one that was furthest off the bell chart on page 112 towards Pinion. You had three others that were all in Latin America that were also above 99% of those other companies. And so it's not, you know, there's nothing in the record saying, hey, these other supply points were similarly off the charts as those six. The Egypt one was also owned by Atlantic Industries, which probably explains why that was included in the seven. So it had nothing to do with the U.S. tax treaty agreements? There's nothing in the record to support that. That's a conspiracy theory. They have nothing to support that. They could have questioned and said, hey, Dr. Lawson, why did you pick these particular supply points? Were you told not to pick the ones with treaties? But there's no evidence. They may not have effectively litigated that question, but I don't know that it seems like a conspiracy theory, given that there is one thing that the ones that were not covered have in common, and that's the particular tax treaties. You know, it's a theory, but there's nothing to say anything about whether they were similar to the other supply points. But in all events, the Commissioner has the resources that it has. He chooses to audit what he can. This case proves just how resource-intensive these sort of examinations are, and the case law is very clear that the Commissioner can choose what he's going to examine. Here, examined, the four that were at the top, plus Mexico, which was a branch. So it seems a little, I mean, for lack of a better word, arbitrary, that you're going to impose different methods of calculation for different companies involving the same sort of transactions. And so, because the issue is, Coca-Cola has to negotiate contracts. So if they understand that the contract with Ireland is going to be a different method of calculation, maybe then their contractual discussions would have been different. But, I mean, it sort of seems to me very arbitrary that you're going to have different calculations. Well, first of all, going forward, Coca-Cola can get their transfer pricing experts and say, hey, in light of what the tax court found, should we be changing these other supply points? Well, I understand that going forward. That's why, normally, you don't apply things retroactively like that. But you do in the tax context. In the tax context, efficiency procedures are retroactive. And there's no right to notice that. But normally, people have an understanding of what the rules of the game are. The rules of the game here are set forth in the regulations. The regulations tell you it has to be an arm's-length price. It has to be the best method. It has to conform with the commensurate with income standard in section 42. And why are not the intangibles calculated? Because it seems to me that intangibles actually have value. Why are they not part of the calculation? The tax court gave a lot of very, very, very detailed and well-supported findings to say, number one, the supply points really didn't own much in the way of intangibles. But in all events, it doesn't really matter because the bottlers had at least as good and, in fact, a better claim to intangibles. The bottlers did as much trade marketing as Coca-Cola did in consumer marketing. The tax court found that that trade marketing was just as valuable and produced just as much benefit. They also had other intangibles, including distribution networks, which the supply points didn't have. Customer relationships and lists, which the supply points didn't have. And all of that is going to contribute to the return on assets that the bottlers got, which was used to provide the return on assets for the supply points. And so, to the extent they had intangibles, it's built into the return on assets that the bottlers provided that was then used to provide the return on assets. Can you address the Brazil issue and the 3M opinion? Absolutely. To start off, no. Brazil did not use dividends in order to pay royalty obligations to 3M. They did pay dividends, but they were never, ever allocated to pay the royalty obligations. Instead, they simply limited the royalty obligations to the amount that was limited by Brazil law. Secondly, the Brazil law does not block... Isn't it odd that the dividends were about the same amount as the royalties would have been under 1050-50? No, it's not odd. That was by design here. Well, right, but that's what I'm saying. Doesn't that demonstrate that that was kind of a renaming rather than a separate dividend transaction that would be allowed? There's nothing in Brazil law or United States law that prevents you from saying that something is a dividend for Brazilian law purposes and a royalty for United States law purposes, and that's precisely... In fact, there's a revenue procedure that told Coca-Cola how to do that here, and the tax court talks about this in both of its key opinions here. What you really have is a situation where this is a parent-subsidiary relationship, unlike in First Security. In First Security, you had two subsidiaries, one of which was barred from receiving certain money. Here, there's nothing in Brazilian law or federal law that prevents Coca-Cola, as the parent of this wholly-owned subsidiary, from receiving the funds from Brazil in the form of dividends and then saying, and that satisfies the royalty obligation, which is exactly what they did. 3M simply got it wrong because they didn't understand that this case is distinguishable from First Security. Both sides here, both sides agree that in First Security, the Supreme Court was attempting to apply the standard definition of income from the code. Under the Moore case, which we cite in our 28-J response letter talking about the 3M case, and you'll also see it discussed in our petition for rehearing, which was attached to the 28-J reply by Coca-Cola, the standard definition of income definitely says that if you can receive it in any way, even if you can't force its distribution presently, even if you couldn't repatriate, as long as this is economic gain to you, then it can be allocated to you. Here, we have these valuable, valuable intangibles. The intangibles that really aren't being talked about by Coca-Cola are these super-valuable intangibles that they owned and that they held very close to them in their contractual relationships with the CERF codes that did most of the consumer marketing. They said, even if you produce marketing intangibles, those belong to us as well. These valuable, valuable intangibles are what produced the tremendous value for the entire company, and that's what should be being compensated here. That's true for Brazil as it is for everywhere else. There simply is no way in which, in this income, under First Security, under Section 482, in any way or sense, they could receive this income just as they did before the deficiency notice was issued here. Turning back to the CPM, if I could, there were a lot of arguments made here about, well, what is the alternative? They said, we tried it with Dr. Willig, and Dr. Willig said, if you just adjust the CPM to give some more credit for intangibles. Dr. Willig's report was completely contradicted by many factual findings by the tax court. The tax court found that, number one, actually, the supply points did not have a great claim to great intangibles. They had licenses, but any rights that flowed from them were kind of illusory because they could be terminated without compensation. He gave a specific example of what happened when they closed the Peru supply point. There was no compensation for any intangibles that, in theory, were owned by the Peru supply point before they were terminated. He pointed out that the marketing intangibles really, for the most part, the marketing wasn't being done by these companies. For the most part, the marketing was being done by the SERVCOs, and then the money was being put on the books after the fact. What's your response to the argument by your friend on the other side? I think that for three of them, they were doing the marketing, and then for three, it was actually the SERVCOs. I'm not sure that those three were doing all of the marketing as opposed to some of the companies that didn't have very many employees doing that work. The record shows that Coke said, we own any marketing intangibles that are produced by consumer marketing. It is ours. We own all the intangibles. We own the marketing intangibles. By contrast, you have the bottlers. The bottlers were doing as much trade marketing as the company was doing consumer marketing. Coca-Cola tried to argue, well, that's not nearly as valuable, but the tax court found otherwise, citing to our experts. They said, this is actually very key, the trade marketing, all of the work that they do with the stores, with the restaurants, with putting their coolers where they do, with having their trucks, all of the things that they do to market on a trade level is just as valuable for keeping Coca-Cola top of mind. We would review those factual findings for clear error, correct? That's right. To me, that's really one of the core problems with Coca-Cola's case on appeal, is they're making these arguments about the CPM, but they're not actually showing clear error. They're showing potentially that perhaps the tax court could have found something different if they decided to rely on Dr. Willig, but instead, the tax court, in an extraordinarily detailed and lengthy and serious opinion, made many factual findings, and these are fully supported. The Willig adjustment was fully addressed by our experts, Dr. Metric, and you can look at Exhibit 8486R at 919 in 38 to 50, especially Paragraph 74 to 86. You can also look at the Newland rebuttal report, that's 8295-R, at 3 to 14, 32 to 35, 46 to 53, especially 51 to 53. The fact of the matter is, that's enough to survive clear error, and what we really have here was a court that took very seriously the arguments that Coca-Cola made. It pointed out that really the only arguments that were being made on the fairness front were, hey, we have legitimate reliance, and they said, no you don't. You have a long expired closing agreement that does not give you any right to a particular method going forward. You have prior audits where they didn't promise they were going to keep doing 1050-50 in the future. He cites a 2009 statement about it as something being appropriate, but that was in a context where Coca-Cola had actually said that they were doing a 1050-50 analysis, but hadn't actually transferred the money, as I understand it. Do you know, this may not be relevant because it may not be in the record, but do you know what the process was, kind of timing wise, on the earlier settlement that led to 1050-50? Was that a prospective settlement? No, it was retrospective. It was also retrospective.  Oh, that's right, yeah. It was covered from 1987 to 1995. So by the time you get to 2007, you have an agreement that had been dead for 12 years. The only thing that it had that was prospective was something saying, well, if you use this, you won't get any penalty if there's an adjustment. What about the argument about the 2009, I don't know if notice is the right word, but the 2009 indication that 1050-50 was still the way to go? That was in the context of a disagreement about Indonesia, and it dealt with, as I understand it, there was a disagreement as to whether they had applied it properly, and if they had properly transferred the funds. And so in that situation, they said, oh, okay, applying 1050-50, this is the amount of money that should be transferred. That's all that was said. It certainly wasn't saying that going forward or even for tax years 2007-2009, because that wasn't for tax year 2009. It was a statement in calendar year 2009 about a past year. And again, that's how it works. Taxes are done retrospectively. It has to be. That's the system of self-reporting that we have, and that's what this court recognized in Knight-Ritter. You know, the Indonesia example just provides just yet another example of, okay, you reported something. Now we're looking at it, and we're telling you, okay, maybe you should change something or maybe you don't need to change something, but we're looking at it in the past. And that's the way it has to be, because any time that there's a deficiency procedure going on, it has to be retrospective. So what's going on for 2010 through 2025? As I understand it, they're sort of in limbo, pending what happens in this case. But I will also say any taxpayer in Coca-Cola's situation that has, you know, related entities that they have transfers between, get a transfer pricing analysis done and try to get an advanced pricing agreement to get the sort of certainty that Coca-Cola is claiming that it had here. How typical is that? I think there's plenty of them done. You know, but to my, as I understand it, Coca-Cola never tried before 2007 to 2009 to get that sort of advanced pricing agreement. And that is in place specifically because, you know, if you can come forward to us and you have your analysis and you have your data and it looks good to us, maybe we negotiate, maybe we say that's not, we don't quite agree with it, but you can at least come and try to get that advanced pricing agreement. And as the tax court pointed out, you know, they didn't do that. What they're trying to do is say here's this expired agreement and here's these times when we tried to get, you know, some pricing agreements internationally with other countries. You know, so we're just going to rely on it going forward and we're not going to do that analysis. To my understanding, they hadn't even done a transfer pricing analysis for 2007 to 2009. At a minimum, they didn't produce it when it was requested in discovery in this case. I'll ask Mr. Gar the same question, but would you say that their obligation here is not only to show that CPM doesn't work, but to show what else would instead? I think they're asking us if we think CPM doesn't work to remand for consideration of what would, but my understanding is that the tax court already did that analysis. So what's your understanding of their requested relief? I'm not fully sure I understand their requested relief because they've abandoned all of their alternative transfer pricing proposals. You know, there were a bunch of them. There was a control, there was a cut, there was something based on marketing services. They've abandoned all of those. The only thing that they are continuing to argue for is the Willig adjustments to the CPM. And as we've said, that falls directly in line of the problem of not having shown clear error as to the tax court's various findings. I honestly don't think there's really anything that's truly on appeal here that survives the clear error analysis. So I don't see how there's anything really to remand. Now, it is the taxpayer's burden to show that the Commissioner's proposed method and its results were unreasonable. We don't believe that they have done so. You know, as the tax court pointed out, there's still extraordinary returns here. If I could, I know my time is up, but if I could go to one of the things that my opponent said towards the end of his argument, and that was, well, if you had a supply point that invested nothing, they would still get the same return, but they could maybe get more return if they gold-plated. And that's problematic for two reasons. Number one, it's not like it's the supply point's choice. They can't sit there and say we're not going to invest anything. Koch put it on their books. Number two, if you truly had a supply point that somehow managed to say we're not going to let you put it on our books, even though you wholly own us and can tell us that we're doing that, they would lose their business. Coca-Cola doesn't have to stay with any one of these supply points. That is part of the point of what the tax court found here, is that Coca-Cola can at will, without compensation, move production, close supply points, and so if you truly had a supply point that was failing to do whatever it's supposed to be doing, it would simply lose its business. Now, on the gold-plating, what that would say is that would be a time for the commissioner to come in and say, hey, you're trying to boost the return for this entity by gold-plating your operating assets. We don't think that's actually an operating asset, and we're going to challenge that retrospectively, because of course it's retrospective, it's tax. Thank you. If there are no questions for my colleagues, we appreciate your argument. Thank you very much. Mr. Garr, you've got three minutes for rebuttal. Thank you, Your Honors. To start with the bait and switch argument, we did make the due process argument. It's at pages 23 to 24 of our brief. The government has, you know, once again just glossed over all the many circumstances apart from the 1996 closing agreement that created reliance interests, and I'll just point you back to the 2009 statement, which I think my friend improperly mischaracterized it. This was at the end of an audit report explaining the government's thinking, and it said, quote, the continuing application of 1050-50 to post-1995 years seems appropriate. That was a confirmation that what Coca-Cola was doing was lawful, and that's at Exhibit 246, page 2, and at the same time it was continuing to apply the method to the other supply points. Now, today my friend says that, well, the other supply points might have been different, but they waived that argument. They didn't make that argument in response to our very prominent inconsistency argument in our brief. They simply said the IRS motives don't matter, but we all know why the IRS didn't apply 1050-50 to those other supply points, and it's because it would have faced the double taxation treaties. Did that get explored in the tax court? I believe we've made that argument below, I mean, in particular in our reconsideration motion, Your Honor. It's part of the circumstances, and I think this argument was not waived. What was waived was the government's response here that those supply points might have been different. But wouldn't you, I mean, wouldn't you need, wouldn't you need to have some kind of testimony in order to establish why those were or are not different? And reconsideration, I think, makes that maybe not impossible, but certainly less possible. Well, I think that the most important fact is the government hasn't denied it. They didn't deny it below. They didn't deny it in their brief here. The only thing that they suggested today is that there might have been differences, but they don't deny that those 11 supply points were subject to double taxation treaties. Is that their burden? Are they, I mean, you presented an argument for why they did something. They said that's not the reason and that's that. I mean, were there any findings from the tax court? Because as we've been reminded, we're here on a clearly erroneous standard. Any findings on that point? There weren't, again, Your Honor, because they waived, we made the inconsistency argument prominently below in the reconsideration motion and in our opening brief here. And they never denied or argued that there was a reason why those supply points were treated differently. They just said motives don't matter. And so they've waived that argument. And that's one piece of the equation, the fundamental inconsistency, which alone renders the CPM, application of the CPM to six supply points. If there's no evidence on it, though, do we consider it either way? I mean, if there's no evidence, they were different and also no evidence in the record that they weren't different, then how are we able to take account of that? Well, I think they waived the argument, Your Honor. I mean, if the court has any doubt, it could remand on that issue. But I don't think you need to because the bait and switch was arbitrary and capricious because they. Why was Mexico dropped? Mexico was because they put a litigation that they rendered a substitute litigation. So it fell out. Also, Mexico is just different because it's a it's a branch. So it's different tax treatment. So it's just it's not like the others. That is different. And we've explained that in our briefs as well. This court can and should set aside the taxes on the ground that the the retroactive switch was arbitrary and capricious under. What is the status right now? Judge Grant axed earlier 2010 to today. So I agree with the government. The government is basically holding everything until a resolution of this case. Those no action has been taken. So it's a 2000 2009 years that are issued here. It's those years that are subject to the bait and switch argument. And that's a sufficient basis to reverse. And we do think that, you know, even if the court excused that, which no other agency could get over, that the the new method itself is legally flawed. Now, my friend tried to pivot to the factual findings. But as I've explained, the decision is predicated on a blatant legal error, this legal ownership test, which completely skewed and eliminated from consideration any meaningful assessment of the supply points own intangibles. I was going to say, how do you how do you address her argument that all notice of deficiencies are retroactive? Well, sure. But in the typical taxpayer situation, we all pay our taxes. And if the government wants to come back next year and says we're we're holding to a new method, it can absolutely do that. And in Knight Rider, Knight Rider, this court's case, the evidence was that the government did not object and that there was there there actually was a change in factual circumstances. There was an acquisition of subsidiaries. Here, there's no change in circumstances. And the government repeatedly told Coca-Cola that the 10 50 50 method produced arm's length results and was appropriate. And that's what creates the bait and switch. Once the government does that through these extraordinary circumstances, it can't retroactively say you screwed up, you trusted us and continue to apply that method. But your your main point for that is that the 2009 discussion, right? Because the settlement agreement certainly says it wouldn't penalize you for relying on the 10 50 50. But it it doesn't it doesn't suggest that that is necessarily the method going forward. That's right. That settlement agreement was backward looking. Now, there was a statement in there that wasn't qualified in any way that 10 50 50 produced arm's length results for federal tax purposes. But we don't rely only on that agreement. We rely on the 2009 statement that the continued application a decade later was appropriate. The fact that doesn't have wouldn't have to say that that was an appropriate measure of arm's length or else the settlement would be in violation of the 42. Well, I think, yes, but but I think the government wouldn't have entered into the settlement and they'll give the IRS this credit, it wouldn't have entered into the settlement if it thought it was unlawful. And that was that, you know, 10 million or billion dollar question is like, does this produce arm's length result? And the government said, unequivocally, it does for 42 in that agreement, but we don't rely on in that agreement, we rely on the subsequent conduct, including the continued application as to 11 other supply points, and the fact that the the IRS enlisted us to go out and try to convince other countries to accept 10 50 50, which is another strain of it. So I think, you know, under ordinary arbitrary and capricious principles, no other agency could get away with treating an American this way. And our fundamental position is, but how, I mean, how, how is that? How is that true in the sense that this would be applying the same kind of the same clear error review for factual findings, de novo review for legal findings, right? I mean, what we discussed before was that a lot of your arbitrary capricious arguments were related to rulemaking, which isn't, which isn't in play here, I would say. So, I mean, I've seen some of the amicus briefs on exceptionalism. And I think that's a that's an interesting debate, certainly, but I'm not sure that it's directly relevant here. How tell me why it is. So number one, we also make the due process argument, and the government's responses, we didn't make it there wrong about that. Again, it's page 23 to 24 of our brief. Where did you make it below? Also, we did in the reconsideration motion, we absolutely did. And not but not prior to the reconsideration motion. Well, again, the government, the tax court rejected reconsideration motion, because first, it said these arguments have been raised earlier, we clearly made the central argument that the IRS had pulled the rug out from underneath us. And that's, in fact, in the tax court's decision. So there's absolutely no waiver here. The tax court rejected those arguments, it was wrong. The arguments have been fully briefed before this court, and the court should apply the law that would apply to any other agency. But but if the court, go ahead. If the court disagrees with that, Your Honor, on CPM, this is not a clear error factual case, this is a legal error case. The decision was driven by the tax court's rule that none of the intangibles mattered because Coca-Cola owned the trademarks. Now, my friend talked about the discussion of comparability with the bottlers, and that doesn't solve the problem, because that discussion is at page 186 of the tax court decision, actually recognized that both sides had intangibles. And once you do that, and this is where the regulations come back into play, it's 5B-5B4 and 5C2, once you recognize intangibles come into play, then you have to factor that into the CPM analysis and the calculation of profit level indicator. Because why on earth would you try to determine what profits in arm's length transaction would take place in companies that have both tangible and intangible assets by looking only to tangible assets? That makes zero sense. It's the height of arbitrary and capricious. The reason why the government did that was it was a way to massively hike the taxes that Coca-Cola would have to pay, but it was clearly wrong. So what's the legal question? Because then again, it sounds like it was a finding as to how to treat the intangibles as opposed to whether they could be considered at all. Or is that the legal question? So the legal question is first, was the tax court right to say that the supply point companies own licenses and their own marketing and investments in those licensees doesn't matter as a matter of law because Coca-Cola itself owned the trademarks. And that's clearly wrong. And once you, if you agree with that, then the linchpin of the tax court's decision is wrong and with respect, I think you have to send it back so that the analysis can take into account these intangibles. And the second legal error, Your Honor, is even if you get to the point of applying the CPM method, the regulations, 5B4, 5C2, make clear that where a company, companies do have intangibles and the tax court ultimately recognized this, it did on page 186, and it did also on page 144 where it's explicitly acknowledged that supply point companies do make impacts in local, in marketing local products, that once you acknowledge that intangibles are in the mix, you have to factor them into the CPM analysis. You can't have analysis that only considers tangible assets. So that was a second legal error. I do have the same question that I asked Ms. Rubin, which is, what is your obligation right now in terms of the relief you're seeking? You not only, as I understand it, you need to show that CPM does not satisfy 42, but do you also need to argue that CPM does not argue for what would? And if not, why not? So number one, the IRS cannot impose billions of dollars in taxes on the basis of a method that's arbitrary and capricious. Full stop. Number two, I think we have presented many alternative grounds, including Mr. Willig's analysis that my friend referred to, which took the government CPM and made one change. It accounted for intangibles and produced a completely different result. And so if this agrees, if this court agrees that there was a legal error in the tax court's decision as to the CPM analysis, then I think you have to send it back, just like the Eighth Circuit did in the Medtronic cases, where it found errors with the regulations and sent it back. I mean, the issues here are too important just to sort of gloss over these legal errors on the basis of claimed factual disputes, which we're not making here. We're making legal errors. The IRS has to get it right if you get to the point of analyzing the CPM method. And the last point I would make, just on Blockdingtom, Your Honor, I think the most telling statement my friend made on that is that 3M got it wrong. And that's basically what they argued in their rehearing petition to the Eighth Circuit, which it rejected. The Solicitor General just recently, as of the last few days, declined a petition for certiorari in 3M. There's no reason for this court to create a circuit conflict with 3M, and there's no basis to distinguish 3M on its facts. I mean, what the Eighth Circuit said at the end of that decision is that the IRS's argument there was potentially breathtaking in its reach, and it's no different here. So I think for all of those reasons, this court should reverse the tax court decision and not allow the imposition of the billions of dollars of new taxes that the IRS is seeking to impose through these unlawful methods. Thank you. We appreciate your arguments, and we have your case. Let's take a short break before we hear our last case.